FILED

2020 Jul-28  AM 08:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **THOMAS E. REYNOLDS, as Trustee,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **2:18-cv-01453-ACA** |
| | ] | |
| **BEHRMAN CAPITAL IV L.P, et al.,** | ] | |
| | ] | |
| **Defendants.** | ] | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the court on Defendant Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.'s ("Mintz Levin") motion for summary judgment. (Doc. 40).

Mintz Levin is a law firm that represented Atherotech, Inc., a laboratory that conducted testing on blood cholesterol levels. (*See* Doc. 22 at 3 ¶ 9). Atherotech, Inc., and its holding company, Atherotech Holdings, Inc. (collectively, "Atherotech"), declared bankruptcy in March 2016. *In re Atherotech, Inc.*, case no. 16-br-909-TOM7, Doc. 1 (N.D. Al. Bankr. March 4, 2016); *In re Atherotech Holdings, Inc.*, case no. 16-br-910-TOM7, Doc. 1 (N.D. Al. Bankr. March 4, 2016). Mintz Levin filed a bankruptcy claim against Atherotech, Inc. for $181,397.99 in unpaid legal fees. *In re Atherotech, Inc.*, case no. 16-br-909-TOM7, Doc. 116-2 (N.D. Al. Bankr. Sept. 26, 2017).

The bankruptcy court appointed Plaintiff Thomas Reynolds as the trustee of Atherotech's estates. *See In re Atherotech, Inc.*, case no. 16-br-909-TOM7, Doc. 7 (N.D. Al. Bankr. March 7, 2016); *In re Atherotech Holdings, Inc.*, case no. 16-br-910-TOM7, Doc. 40 (N.D. Al. Bankr. August 11, 2016).   In March 2018, Mr. Reynolds, as trustee for Atherotech's estates, filed suit against a number of defendants, including Mintz Levin.  (Doc. 2-1 at 9).  Mr. Reynolds alleges that Mintz Levin's legal advice to Atherotech was (1) negligent ("Count One"); (2) a breach of the contract between Atherotech and Mintz Levin ("Count Three"); and (3) an unjust enrichment for Mintz Levin ("Count Four").[1]  (Doc. 22 at 11–15).  He also objects to Mintz Levin's bankruptcy claim ("Count Two").  (*Id.* at 12–13).

The court **GRANTS** Mintz Levin's motion for summary judgment on all counts.  Mr. Reynolds has not presented evidence creating a genuine dispute of fact about whether Mintz Levin's legal advice was unreasonable, so he cannot prevail on his negligence claim.  Mr. Reynolds also has not presented any evidence that Mintz Levin failed to perform its duties under the contract, so he cannot prevail on his breach of contract claim.  And because Mr. Reynolds has not presented any evidence that Mintz Levin's enrichment was unjust, he cannot prevail on his unjust

---

[1] The amended complaint titles the unjust enrichment claim: "Count III—Alternative Claim for Unjust Enrichment."  (Doc. 22 at 14).  But the amended complaint already had a third count; accordingly, the court will refer to this count as Count Four.

enrichment claim.  Finally, because all of Mr. Reynolds' substantive claims against Mintz Levin fail, he cannot prevail on his objection to its bankruptcy claim.

## I.     BACKGROUND

On a motion for summary judgment, the court "draw[s] all inferences and review[s] all evidence in the light most favorable to the non-moving party." *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012) (quotation marks omitted).

### 1.   Evidence Used in Describing the Relevant Facts

Before the court can describe the facts, the court must address a dispute about what evidence the court may rely on at this stage.  Mintz Levin's brief relies heavily on deposition testimony from Mr. Reynolds, who was testifying as the trustee for Atherotech's estates.  (*See, e.g.*, Doc. 43 at 15 ¶ 24, 16 ¶¶ 26–27, 17 ¶¶ 29–30, 18 ¶¶ 32–33, 19 ¶ 41, 21 ¶¶ 45–47, 22 ¶ 50).  Mr. Reynolds argues that Mintz Levin cannot rely on his testimony because Mr. Reynolds was not testifying as Atherotech's corporate representative, nor does he have any personal knowledge of the events at issue in this case. (Doc. 44 at 6 & n.1; *id.* at 25–28).  Mintz Levin responds that reliance on Mr. Reynolds' testimony is proper because the Federal Rules allow it to "use for any purpose the deposition of a party."  Fed. R. Civ. P. 32(a)(3).

The court agrees with Mr. Reynolds that much of his deposition testimony is inadmissible because it is not based on Mr. Reynolds' personal knowledge. *See* Fed. R. Civ. P. 56(c)(2) (requiring that facts "be presented in a form that would be admissible in evidence"); Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). However, much of Mr. Reynolds' testimony is Mr. Reynolds reading or opining about other evidence that Mintz Levin has presented in its motion for summary judgment, such as deposition testimony from other witnesses. (*See, e.g.*, Doc. 43 at 15 ¶ 24, 16 ¶ 27, 17 ¶¶ 29–30, 18 ¶ 32, 22 ¶ 50). Accordingly, even if Mr. Reynolds' testimony is not admissible, the underlying evidence about which he was testifying is admissible. The court's description of the facts will, therefore, rely on the admissible evidence.

2.  Relevant Facts

Atherotech operated a laboratory that tested blood cholesterol levels. (Doc. 43 at 9 ¶ 1; Doc. 44 at 6 ¶ 1). Physicians ordering blood cholesterol tests had several options for getting blood samples to Atherotech, from having their own staff drawing the blood at the physician's expense, to hosting a laboratory's phlebotomist in-office, to referring patients to a hospital's draw site. (*See* Doc. 41-3 at 41). This case involves one of those options—paying a physician to conduct the blood draw and to process and ship the blood sample to Atherotech for testing.

In 2005, a different laboratory requested an advisory opinion from the U.S. Department of Human and Health Services, Office of Inspector General ("OIG") about the propriety of providing referring physicians with free blood drawing supplies and payments of between $3 and $6 per blood draw. (Doc. 41-13 at 3). The OIG's advisory opinion concluded that such an arrangement "would clearly implicate" the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and might violate the False Claims Act, 31 U.S.C. § 3729, because Medicare paid only $3 per patient encounter for specimen collection fees, plus the cost of any blood drawing supplies. (*Id.* at 5).

After the OIG issued its 2005 advisory opinion, Atherotech stopped paying fees for blood specimen collection and handling. (Doc. 41-6 at 9). In 2008, Atherotech asked attorney Gregory Root for a legal opinion about paying draw fees and processing and handling ("P&H") fees. (Doc. 41-14). Mr. Root opined that although specimen collection arrangements presented some risk, those arrangements could be structured to minimize the risk by separating compensation for specimen collection (*i.e.*, the blood draw) from compensation for specimen processing and handling (*i.e.*, the P&H fee). (*Id.* at 2–4). He specifically recommended limiting the blood draw fee to $3 and conducting studies to determine the fair market value of any P&H fee payments. (*Id.* at 4). In 2009, Mr. Root provided another memorandum making the same recommendations. (Doc. 41-15).

According to a 2009 email sent by Atherotech's Chief Compliance Officer, Les Hric (*see* doc. 41-9 at 1 ¶ 2), after Atherotech received Mr. Root's legal opinion, it "started to pay [draw fees] once again in order to remain competitive in the market place." (Doc. 41-6 at 9). Atherotech conducted "time and motion studies" to determine the fair market value of processing and handling the specimens, and determined that $7 was appropriate. (Doc. 41-9 at 3 ¶ 5). It therefore began offering a $3 draw fee and a $7 P&H fee when a physician's office did the blood draw and sent it to Atherotech for testing. (Doc. 41-9 at 2–3 ¶¶ 3–4). Mr. Hric's email noted that "[b]y following the guidelines of [Mr. Root's] memorandum we hope it has allowed us to limit our risk of violating civil, criminal, and administrative provisions." (Doc. 41-6 at 9). But he emphasized that although Atherotech had "taken the necessary steps to minimize our exposure to risk . . . that does not mean our program is *risk free* to us or our physician customers as far as the OIG is concerned." (*Id.*) (emphasis in original).

In 2010, Atherotech learned that some of its competitors were engaging in what Atherotech viewed as illegal activity to induce physicians to pick those laboratories for blood testing. (Doc. 41-8 at 3 ¶ 5; *see also* Doc. 41-3 at 24–25, 40). Among other problematic practices, Atherotech believed that its competitor Health Diagnostics Laboratory ("HDL") and several related entities were paying "above-market P&H Fees" of up to $20. (Doc. 41-8 at 3 ¶ 5; Doc. 41-21 at 2–3 ¶ 4; *see also*

Doc. 41-3 at 24–25, 40).   In January 2011, Atherotech retained Mintz Levin to explore options for how to address the threat HDL represented.  (Doc. 41-8 at 4 ¶ 9; *see* Doc. 41-3 at 24–25; Doc. 41-4 at 43; Doc. 41-9 at 4 ¶ 7).   Mintz Levin's engagement letter stated that "[a]s legal counsel for Atherotech, the Firm will provide such legal and regulatory advice as you request."  (Doc. 44-9 at 1).

The Mintz Levin attorney who did most of Mintz Levin's work for Atherotech was Hope Foster.  She testified that Atherotech had reported "substantial difficulty in competing with" HDL and two related entities because of their marketing practices.  (Doc. 41-4 at 43).  About a month after Atherotech retained Mintz Levin, Ms. Foster prepared an outline of issues to discuss at an Atherotech board meeting. (Doc. 41-24).   That outline stated that "[p]ayment to physicians of amounts associated with specimen handling and draw fees is a growing issue," and that "[t]he picture is murky."  (*Id.* at 5).  Ms. Foster suggested a variety of possible avenues to explore, including reporting "the conduct" to federal authorities, state authorities, filing a whistleblower case, seeking an advisory opinion from the OIG, and petitioning the OIG to issue a fraud alert.  (*Id.* at 7).  When Ms. Foster presented these options to Atherotech's Board, she discussed "the pros and cons of each option."  (Doc. 41-21 at 3 ¶ 8; Doc. 41-9 at 4 ¶ 9).

One of the options that Ms. Foster discussed with Atherotech's Board was reporting its competitors' conduct to the Department of Justice ("DOJ").  (Doc. 41-

7

21 at 4 ¶ 9).  She told them that "this involved risks, especially because Atherotech itself paid P&H Fees, although Atherotech's P&H Fees were significantly lower than HDL's P&H Fees."  (*Id.*).  She recommended that the Board think carefully about this course of action, advising that there was a risk to Atherotech because of the sentiment expressed by the proverb 'those who live in glass houses should not throw stones.'"  (*Id.*).  Several of Atherotech's Board members testified that the Board understood this risk and that they knew that by reporting another company's practices to the DOJ, "the first question [the DOJ is] going to ask is 'Tell us what your practices are and let's make sure that we're not using you for some commercial—devious commercial purpose. . . .  Prove that you're pristine.'"  (Doc. 41-4 at 23; Doc. 41-8 at 4 ¶¶ 8, 10–13; Doc. 41-9 at 4 ¶ 9).

Atherotech, along with several other laboratories that were concerned about HDL's practices, ultimately decided to report HDL's practices to the DOJ.  (Doc. 41-8 at 5 ¶ 15).  That meeting occurred in July 2011.  (Doc. 41-29 at 2).  At that time, the DOJ did not suggest that any laboratories should stop paying P&H fees. (*Id.* at 4 ¶ 12).

In 2011, relators filed sealed *qui tam* actions against various laboratories relating to their P&H fee arrangements.  (*See* Doc. 43 at 18 n.8; Doc. 44 at 13 ¶ 34). In 2012, relators filed sealed *qui tam* actions against Atherotech based on its specific P&H fee arrangements.  (*See* Doc. 43 at 18 n.9; Doc. 44 at 13 ¶ 35).

In September 2012, the DOJ contacted Atherotech and other laboratories about its investigation into the industry's payment of P&H fees. (Doc. 41-31; Doc. 41-32). The evidence does not make clear whether the DOJ's investigation was prompted by the July 2011 meeting at with Atherotech and other labs reporting HDL's various marketing practices, or by the *qui tam* actions filed in 2011 and 2012, or both. In any event, Atherotech agreed to cooperate with the DOJ's investigation. (Doc. 41-31 at 2). Atherotech again retained Mintz Levin in connection with the DOJ investigation (doc. 41-21 at 5 ¶ 17), which extended into 2014 (*see* doc. 41-31 at 2).

On March 12, 2014, an attorney from the DOJ sent Ms. Foster a letter stating that it was investigating Atherotech's practice of paying P&H fees. (Doc. 41-37 at 2). The letter stated that "it appears to us that your client's payments to referring providers raise an inference that one purpose of those payments was to induce referrals." (*Id.*). On June 25, 2014, the OIG issued a Special Fraud Alert about laboratory payments to referring physicians. (Doc. 41-39). The Special Fraud Alert specifically stated that the Anti-Kickback Statute "is implicated when a clinical laboratory pays a physician for services. . . . regardless of whether the payment is fair market value for services rendered" because of the concern that the intent may be to induce or reward referrals. (*Id.* at 5). Mr. Reynolds concedes that this was the first indication from the government that paying fair market value P&H fees might

violate the Anti-Kickback Statute or the False Claims Act. (*See* Doc. 43 at 22 ¶ 49 (Mintz Levin's assertion of that fact); Doc. 44 at 16–17 ¶ 49 (disputing only the inference that the lack of guidance establishes the reasonableness of Mintz Levin's advice). After the issuance of the Special Fraud Alert, Atherotech stopped paying P&H fees. (Doc. 41-4 at 25; Doc. 41-8 at 6 ¶ 21).

In March 2016, Atherotech, Inc., and Atherotech Holdings declared bankruptcy. *In re Atherotech, Inc.*, case no. 16-br-909-TOM7, Doc. 1 (N.D. Al. Bankr. March 4, 2016); *In re Atherotech Holdings, Inc.*, case no. 16-br-910-TOM7, Doc. 1 (N.D. Al. Bankr. March 4, 2016). A few months later, a relator filed a $25 million claim against Atherotech, Inc. on behalf of the United States. *In re Atherotech, Inc.*, case no. 16-br-909-TOM7, Doc. 229-1 (N.D. Al. Bankr. Aug. 11, 2016). Mr. Reynolds objected to that claim as untimely filed. *Id.*, Doc. 1671 (N.D. Al. Bankr. Dec. 2, 2019). The bankruptcy court sustained his objection and allowed the claim as a late-filed claim. *Id.*, Doc. 1829 (N.D. Al. Bankr. May 20, 2020).[2]

---

[2] To the extent Mintz Levin attempts to imply that Mr. Reynolds engaged in some wrongdoing with respect to allowing the relator's claim, the court rejects that implication. The bankruptcy records show that Mr. Reynolds objected to thirty-six claims as late-filed, and one of those claims was the relator's claim for $25 million. *In re Atherotech, Inc.*, case no. 16-br-909-TOM7, Doc. 1671 (N.D. Al. Bankr. Dec. 2, 2019). The bankruptcy court's initial order in response to that objection sustained most of the objections and allowed them as late-filed claims, but when it came to the relator's claim, for reasons that are unclear, the bankruptcy court sustained the objection and disallowed the claim. *Id.*, Doc. 1716 (N.D. Al. Bankr. Jan. 15, 2020). Mr. Reynolds' motion to amend pointed out that because his objection was only to the timeliness of the claim, the court should have allowed the claim as late-filed. *Id.*, Doc. 1828 (N.D. Al. Bankr. May 20, 2020). The bankruptcy court, after consideration, granted the motion to amend and allowed the claim as late-filed. *Id.*, Doc. 1829 (N.D. Al. May 20, 2020). The court will not infer from that conduct that Mr. Reynolds engaged in wrongdoing.

Meanwhile, Mintz Levin also filed a bankruptcy claim against Atherotech, Inc. for $181,397.99 in unpaid legal fees. *Id.*, Doc. 116-2 (N.D. Al. Bankr. Sept. 26, 2017).

## II.   DISCUSSION

Mintz Levin moves for summary judgment on all counts. In deciding a motion for summary judgment, the court must determine whether, accepting the evidence in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Hamilton,* 80 F.3d 1316, 1318 (11th Cir. 2012). "[T]here is a genuine issue of material fact if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Looney v. Moore*, 886 F.3d 1058, 1062 (11th Cir. 2018) (quotation marks omitted).

### a.   Count One (Negligence)

In Count One, the Trustee asserts a claim for negligence against Mintz Levin for Mintz Levin's failure to advise Atherotech to stop paying P&H fees and its advice to report Atherotechs' competitors' practice of paying P&H fees. (Doc. 22 at 11–12 ¶¶ 61, 63). Mintz Levin seeks summary judgment on the basis that the claim is barred by the statute of limitations and fails on the merits. (Doc. 43 at 27–36 & 27 n.14).

The parties agree that this claim is governed by Alabama law but that Alabama's statutory cause of action for legal malpractice does not apply because

Mintz Levin does not qualify as a "legal service provider" as defined by that statute. *See* Ala. Code § 6-5-572(2) (defining a "legal service provider"). (Doc. 43 at 27 n.14; Doc. 44 at 29). Proceeding under the common law legal malpractice cause of action does not affect the merits of the negligence claim, which is still evaluated under the same elements as any other negligence claim. *See Indep. Stave Co. v. Bell, Richardson & Sparkman, P.A.*, 678 So. 2d 770, 772 (Ala. 1996) ("In a legal malpractice case a plaintiff must prove, basically, the same elements that must be proven in an ordinary negligence suit.") (quotation marks and alternations omitted). It does, however, affect the applicable statute of limitations.

### i.     *Statute of Limitations*

The parties agree that because Alabama's Legal Services Liability Act ("ALSLA") does not apply, the two-year statute of limitations set out in Alabama Code § 6-2-38(*l*) for general tort claims governs. (Doc. 43 at 27; Doc. 44 at 29–30). Contrary to their contention, however, a non-ALSLA legal malpractice claim is not subject to a two-year statue of limitations, but instead to a six-year statute of limitations. *See* Ala. Code § 6-2-34(8) (providing for a six-year limitations period for "[m]otions and other actions against attorneys-at-law for . . . neglect or omission of duty"); *Jackson v. Kimbrough*, 622 So. 2d 321, 322 (Ala. 1993) ("Under Ala. Code 1975, § 6–2–34(8), the period for filing legal malpractice actions was six years."). Section 6-2-34(8) has not been applied in a legal malpractice claim in many

years because the ALSLA replaced that statute of limitations for cases covered under that Act, but it remains on the books.

Applying the six-year statute of limitations for non-ALSLA legal malpractice claims, Mr. Reynolds' filing of this lawsuit was timely. Even using Mintz Levin's proposed accrual date in January 2011, the statute of limitations would have expired in January 2017. But the Atherotech entities filed for bankruptcy in March 2016, and are therefore entitled to the Bankruptcy Code's tolling provision. *See* 11 U.S.C. § 108 ("If applicable nonbankruptcy law . . . fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of . . the end of such period . . . or . . . two years after the order for relief."). Thus, Mintz Levin is not entitled to summary judgment based on a statute of limitations defense.

### ii.    *Merits*

Mr. Reynolds alleges that Mintz Levin is liable for legal malpractice for (1) failing to advise Atherotech to stop paying P&H fees, and (2) advising Atherotech to report its competitors to the DOJ. (Doc. 22 at 11–12).

To prevail on a legal malpractice claim, a plaintiff must prove:

a duty, a breach of that duty, an injury, that the breach was the proximate cause of the injury, and damages. Additionally, in a legal malpractice case, the plaintiff must show that but for the defendant's negligence he would have recovered on the underlying cause of action,

13

or must offer proof that the outcome of the case would have been different.

*Indep. Stave Co. v. Bell, Richardson & Sparkman, P.A.*, 678 So. 2d 770, 772 (Ala. 1996) (citations and alterations omitted).  The applicable duty is an attorney's obligation to "exercise an ordinary and reasonable level of skill, knowledge, care, attention, and prudence common to members of the legal profession in the community." *Mylar v. Wilkinson*, 435 So. 2d 1237, 1239 (Ala. 1983).  Establishing a breach of that duty is a high bar: "An attorney is not answerable for error in judgment upon points of new occurrence, or of nice or doubtful construction." *Buchanan v. Young*, 534 So. 2d 263, 265 (Ala. 1988).  "[W]hile one's advice may be wrong . . . , it may nevertheless be reasonable." *Herston v. Whitesell*, 348 So. 2d 1054, 1057 (Ala. 1977).

Mintz Levin contends that (1) it satisfied its duty to Atherotech by advising Atherotech about the pros and cons of paying P&H fees and of reporting its competitors to the DOJ; (2) Atherotech cannot establish causation; and (3) Atherotech has not suffered any damages because no court has found Atherotech liable for violating the Anti-Kickback Statute or the False Claims Act.[3]  (Doc. 43 at

---

[3] Mintz Levin also argues that Atherotech has not suffered any damages because the bankruptcy court dismissed the *qui tam* relator's bankruptcy claim.  (Doc. 43 at 26).  Putting aside the fact that the bankruptcy court has allowed the claim as late-filed, *In re Atherotech, Inc.*, case no. 16-br-909-TOM7, Doc. 1829 (N.D. Al. Bankr. May 20, 2020), Mr. Reynolds also contends that Atherotech suffered damages in the form of paying attorneys' fees that would not have been necessary had Mintz Levin advised Atherotech to stop paying the P&H fees back in 2011.  (Doc.

26, 30–31, 33–35).  Mr. Reynolds responds that Mintz Levin breached its duty by failing to (1) "quantify any of the risks discussed with Atherotech"; (2) put its legal advice in writing; and (3) advise Atherotech to stop paying P&H fees.  (Doc. 44 at 29, 34–36).

Mr. Reynolds has not pointed to any cases holding that a failure to "quantify risk" or put opinions in writing constitutes a breach of an attorney's duty to "exercise an ordinary and reasonable level of skill, knowledge, care, attention, and prudence common to members of the legal profession in the community."  *Mylar*, 435 So. 2d at 1239.  The court declines to find that an attorney satisfies the standard of care only by putting a number on the risk a client faces from taking a particular action or by putting all opinions in writing.

As for Mr. Reynolds' contention that Mintz Levin engaged in malpractice by failing to advise Atherotech to stop paying P&H fees before reporting its competitors to the DOJ, the undisputed evidence in this case establishes that Mintz Levin advised Atherotech both that paying P&H fees and that reporting competitors' payment of P&H fees carried risk.  (Doc. 41-5 at 30; Doc. 41-21 at 4 ¶ 9; Doc. 41-4 at 23; Doc. 41-8 at 4 ¶¶ 8, 10–13; Doc. 41-9 at 4 ¶ 9).  Mr. Reynolds does not argue that settled law at the time established that payment of P&H fees at fair market value was a

---

44 at 34–35).  Given the court's finding that Atherotech cannot establish a breach of Mintz Levin's duty, the court declines to address the damages issue.

violation of the Anti-Kickback Statute or the False Claims Act.  Even Mr. Reynolds'
expert witness report acknowledges that the law at the time was unsettled.  (*See* Doc.
41-44 at 15–16 (asserting that Mintz Levin "should have anticipated" the position
the OIG would take in the Special Fraud Alert)).

Given the undisputed evidence that Mintz Levin advised Atherotech about the
risks involved in paying P&H fees and in reporting competitors to the DOJ for
paying P&H fees, combined with the unsettled state of the law on P&H fees at the
time Mintz Levin was giving its advice, no reasonable jury could find that Mintz
Levin's advice was unreasonable.  *See Herston*, 348 So. 2d at 1057 ("[W]hile one's
advice may be wrong . . . , it may nevertheless be reasonable.  An attorney is not
answerable for error in judgment upon points of new occurrence, or of nice or
doubtful construction.") (quotation marks omitted).   Accordingly, the court
**GRANTS** Mintz Levin's motion for summary judgment in favor of Mintz Levin and
against Mr. Reynolds on Count One.

b.      Count Three

In Count Three, Mr. Reynolds asserts a claim for breach of contract.  (Doc.
22 at 14–15).   Specifically, Mr. Reynolds asserts that Mintz Levin's general
engagement letter obliged it to provide legal and regulatory advice, yet Mintz Levin
failed to advise Atherotech to stop paying P&H fees.  (Doc. 22 at 13 ¶ 72).  Mintz
Levin contends that it is entitled to summary judgment because this claim is

derivative of the negligence claim, because the claim is time-barred, and because Mintz Levin performed its obligations under the contract by providing advice to Atherotech. (Doc. 43 at 37–39). Because this claim, too, fails on the merits, the court will not address the other two arguments.

To prevail on a breach of contract claim under Alabama law, the plaintiff must establish (1) the existence of a valid contract; (2) the plaintiff's own performance under the contract; (3) the defendant's nonperformance; and (4) that the breach of the contract caused damages. *Shaffer v. Regions Fin. Corp.*, 29 So. 3d 872, 880 (Ala. 2009). Mintz Levin does not dispute that its general engagement letter constitutes a contract or that Atherotech failed to perform under the contract; thus, the question before the court is whether Mintz Levin failed to perform.

Mr. Reynolds contends that Mintz Levin failed to perform its obligation to provide legal and regulatory advice by failing "to advise Atherotech to stop its practice of paying P&H fees, and additionally fail[ing] to respond to two specific requests regarding the extent of risk associated with Atherotech's business practices." (Doc. 44 at 36). In support of that argument, he points to Ms. Foster's deposition, where she testified that she never "quantified" the risk of going to the DOJ (doc. 41-5 at 7), or put her opinion about the level of risk in writing (*id.* at 12–13, 30). However, Ms. Foster also testified that she and Atherotech's board members discussed the risk of reporting Atherotech's competitors to the DOJ. (*Id.*

at 5, 12–13).  Mr. Reynolds has not presented any evidence to dispute her testimony. (*See* Doc. 44 at 37).  Nor has Mr. Reynolds provided any admissible evidence that Mintz Levin failed to prove legal and regulatory advice at Atherotech's request.  The contract does not require the advice to be correct, especially where the law is, as discussed above, unsettled.  (*See* Doc. 44-9 at 1).

Because Mintz Levin performed its obligation to provide legal and regulatory advice to Atherotech, Mr. Reynolds cannot prevail on his breach of contract claim, and the court **GRANTS** Mintz Levin's motion for summary judgment in favor of Mintz Levin and against Mr. Reynolds on Count Three.

c.    Count Four

In Count Four, Mr. Reynolds asserts a claim for unjust enrichment as an alternative to the claim for breach of contract.  (Doc. 22 at 14 ¶ 74).  Mr. Reynolds alleges that Mintz Levin's provision of bad legal advice was a violation of the "confidential and fiduciary relationship" between Atherotech and Mintz Levin, so that its retention of the legal fees that Atherotech paid constitutes an unjust enrichment.  (Doc. 22 at ¶¶ 78–79).

Unjust enrichment provides a plaintiff an equitable remedy when "the defendant holds money which, in equity and good conscience, belongs to the plaintiff or holds money which was improperly paid to defendant because of mistake or fraud." *Mantiply v. Mantiply*, 951 So. 2d 638, 654 (Ala. 2006) (emphases and

quotation marks omitted); *see also Kruse v. City of Birmingham*, 67 So. 3d 910, 915 (Ala. Civ. App. 2011) ("The retention of a benefit is 'unjust,' for purposes of an unjust enrichment claim, if the donor of the benefit acted under a mistake of fact or in misreliance on a right or duty, or the recipient of the benefit engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship.") (quotation marks omitted).

Mintz Levin argues that this claim is barred by the statute of limitations, by the existence of a written contract, and by the failure to present evidence that any enrichment was unjust.  (Doc. 43 at 37–40).  Again, the court need only address Mintz Levin's argument about the merits of the claim.

The undisputed evidence shows that Atherotech paid Mintz Levin legal fees for work that Mintz Levin performed on Atherotech's behalf.  Mr. Reynolds has not presented any evidence that Atherotech, in paying those fees, "acted under a mistake of fact or in misreliance on a right or duty." *Kruse*, 67 So. 3d at 915.  Nor has Mr. Reynolds presented any evidence or even alleged that Mintz Levin engaged in fraud or coercion. *See id.*  Finally, although the amended complaint alleges that Mintz Levin abused the "confidential and fiduciary relationship" between Atherotech and Mintz Levin (doc. 22 at ¶¶ 78–79), Mr. Reynolds has presented no evidence of abuse of the relationship.  Providing advice that eventually turns out to be wrong is not an "abuse" of a confidential or fiduciary relationship sufficient to

make the retention of legal fees unjust.  Accordingly, the court **GRANTS** the motion for summary judgment in favor of Mintz Levin and against Mr. Reynolds on Count Four.

> d.   Count Two

In Count Two, Mr. Reynolds objects to Mintz Levin's bankruptcy claim against Atherotech based on Mintz Levin's alleged negligence.  (Doc. 22 at 12–13). Mintz Levin contends that because Mr. Reynolds' other claims fail, so too must this claim.  (Doc. 43 at 41).  The court agrees, and therefore **GRANTS** the motion for summary judgment on Count Two.

## III.   CONCLUSION

The court **GRANTS** Mintz Levin's motion for summary judgment.  The court **WILL ENTER SUMMARY JUDGMENT** in favor of Mintz Levin and against Mr. Reynolds on all counts.

The court will enter a separate final judgment consistent with this memorandum opinion and order.

**DONE** and **ORDERED** this July 28, 2020.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE